# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3295-24

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

K.P.,

     Defendant-Appellant,

and

K.MCD. and D.W.,

     Defendants.

_____

IN THE MATTER OF KY.P.,
KE.P., KU.P., KI.P., and K-S.P.,
minors.

_____

Argued May 21, 2026 – Decided July 7, 2026

Before Judges Marczyk and Puglisi.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Union County, Docket No. FN-20-0004-24.

Meghan K. Gulczynski, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Meghan K. Gulczynski, on the briefs).

Julie B. Colonna, Deputy Attorney General, argued the cause for respondent (Jennifer Davenport, Attorney General, attorney; Deborah E. Wassel, Assistant Attorney General, of counsel; Julie B. Colonna, on the brief).

Noel C. Devlin, Assistant Deputy Public Defender, argued the cause for minor K-S.P. (Jennifer N. Sellitti, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Noel C. Devlin, of counsel and on the brief).

PER CURIAM

Defendant K.P. (Kate)[1] appeals from the Family Part's January 15, 2025 order finding she abused or neglected her infant daughter K-S.P. (Kelly) in violation of N.J.S.A. 9:6-8.21(c)(4)(a).  We affirm.

---

[1] Pseudonyms and initials are used to reference the child and other individuals to protect their privacy and preserve the confidentiality of these proceedings. R. 1:38-3(d)(12).

I.

When the New Jersey Division of Child Protection and Permanency (Division) commenced this action in July 2023, Kate was the mother of five children, including her then-newborn daughter, Kelly, who is the subject of this appeal. K.M. is Kelly's father.

On June 14, 2023, Kate entered pre-term labor and gave birth via cesarean section to Kelly at Trinitas Regional Medical Center (Trinitas) in Elizabeth. Two days later, a Trinitas social worker made a referral to the Division, reporting Kate had no prenatal care and admitted to using heroin daily, along with occasional fentanyl and cocaine use, during her pregnancy. The hospital noted Kelly was taken to the neonatal intensive care unit (NICU) for resuscitation and was placed on a "social hold" pending the Division's recommendation. It further reported Kate had not yet completed a psychiatric screening assessment because she was too heavily sedated.

Trinitas discharged Kelly from the hospital after approximately two weeks in the NICU, and the Division emergently removed her and placed her

in a resource home. On July 3, the Division filed a complaint against Kate and K.M., seeking custody of Kelly, which the trial court granted.[2]

A Title 9 fact-finding hearing was held over two consecutive days in June 2024. The Division presented three witnesses: two caseworkers and Maria Baja-Quizon, M.D., a Trinitas neonatologist who treated Kelly while she was in the NICU.[3] Kate was not present for the hearing, and her attorney did not call any witnesses. The Law Guardian also called no witnesses but advocated for the Division's position that Kate abused or neglected Kelly.

The Division's initial caseworker, who responded to Trinitas's referral, testified she met with hospital staff and interviewed Kate, who admitted to using heroin "almost daily," including "up until the day . . . she gave birth" to Kelly. Kate advised the caseworker she used heroin when her children were at school so they would not see her using it, since they all lived in the same home, with the exception of her oldest child, who lived with D.W. Kate's

---

[2] The complaint was also filed against D.W., the father of Kate's oldest child, for the care and supervision of Kate's four older children. Kate's four older children, and her child born during the pendency of this matter, are not part of this appeal.

[3] At a prior case management hearing in February 2024, the Division advised it would be calling two caseworkers and "one of the NICU doctors" from Trinitas to testify. Kate's counsel indicated they were conferring with an expert, but ultimately the defense did not call an expert.

A-3295-24

mother and K.M. supervised her contact with the children. Kate told the caseworker she believed her mother and K.M. would be filing for custody of Kelly. The caseworker noted Kate was coherent, respectful, and able to answer all questions during the interview, although she was in pain from her cesarean section. The caseworker also recounted observing Kelly "crying a lot" and "shaking" in the NICU.

The second Division caseworker was assigned to the case on June 20, 2023, and testified she observed Kelly in the NICU that day in a covered crib, or "bubble," with heat keeping her warm, but did not see her experience any tremors or convulsions. Trinitas staff informed her Kelly's primary symptoms during her NICU stay were poor feeding and loose stools, and she would be discharged once her calcium levels dropped.

Dr. Baja-Quizon testified regarding Kelly's diagnoses and treatment while under her care in the NICU. She worked as a neonatologist for nearly eighteen years. Dr. Baja-Quizon explained Kelly was admitted to the NICU because of her fever and risk of infection, her pre-term status, which put her at risk of difficulty breathing and bottle feeding, and Kate's history of drug use during the pregnancy and lack of prenatal care. She recounted Kelly was diagnosed with a term of thirty-six-week delivery, an "infection rule[-]out[,]

5

. . . neonatal abstinence syndrome [(NAS)], and . . . [a] patent foramen ovale versus an atrial septal defect." Kelly also had mild hypercalcemia or elevated calcium levels. While in the NICU, Kelly received intravenous antibiotics, tube feedings, and underwent "Finnegan[] monitoring" for NAS.

Dr. Baja-Quizon explained NAS is "a group of signs and symptoms that babies can manifest as a result of withdrawal from any kind of drug that they were exposed to in utero," whether the drug was prescribed or not. NAS "can manifest as irritability, difficulty with feedings, jitteriness, diarrhea," or sometimes, in "worst-case scenarios," seizures. Dr. Baja-Quizon testified Kelly "was . . . noted to be irritable and . . . jittery," so she received Finnegan scoring, which is "an objective way to identify certain signs and symptoms that are associated with withdrawal" in babies.

On cross-examination, Dr. Baja-Quizon stated the Finnegan scoring is "objective because . . . it has been tested," "is used by different . . . facilities nationwide," and "takes out the subjective element of . . . people putting in their own input into what they're seeing." Kelly was monitored every three hours for signs of withdrawal, and scoring was done every four hours. She confirmed Kelly was not given morphine to treat her withdrawal symptoms, explaining the typical protocol is to give morphine to infants when they test

6

positive for opiates. Kelly tested negative for heroin, although she tested positive for cocaine.

When asked about the significance of Kelly's Finnegan scoring, Dr. Baja-Quizon testified Kelly exhibited irritability, a high-pitched cry, increased muscle tone, and "difficulty bottle feeding due to incoordination." She recalled Kelly's highest scores were in the seven-range, and babies were typically treated for NAS if their scores were eight or higher. Although Kelly did not qualify for treatment based on her Finnegan scoring, Dr. Baja-Quizon opined Kelly still showed some "mild" signs of withdrawal and thus "required . . . comfort care, which is one kind of . . . treatment that you . . . can give . . . babies with [NAS]." She explained babies receiving comfort care are fed on a regular schedule, swaddled so they feel secure, and placed in a dark and quiet environment with a blanket-covered incubator to minimize environmental noise and stimulation, so they can rest, sleep, and "continue to grow and recover."

Dr. Baja-Quizon testified Kelly "tested positive for cocaine in the urine as well as in the meconium[4] tox[icology] screen." Defense counsel objected to the Division's question regarding how exposure to cocaine can impact a

---

[4] Meconium is a baby's first stool.

newborn as calling for an expert opinion, and in response, the Division requested Dr. Baja-Quizon be qualified as an expert. Defense counsel argued, "when you get to the point of prognosis . . . [and] what may happen to a child, with this type of expert opinion[,] that's where the line does blur with respect to a fact witness versus an expert witness." However, defense counsel clarified the objection was not to Dr. Baja-Quizon's testimony regarding the "day-to-day . . . care that was given to [Kelly] which [Dr. Baja-Quizon] had direct knowledge of as a fact witness." The defense had no objection to the admission of Kelly's hospital records if they were "limited to only treatment and diagnosis."

The court sustained the objection. Although it noted Dr. Baja-Quizon could "easily" have been presented as an expert witness based on her qualifications, it found the Division had presented her "strictly as a fact witness, and as such[,] she ha[d] not written a report," but rather, was "simply relying on her notes and her memory" from the time she treated Kelly. Thus, the court ruled Dr. Baja-Quizon could not testify as to the possible long-term effects of the cocaine on Kelly's health. It declined to qualify her as an expert at that time to avoid unfairly prejudicing the defense, given the defense had no

8

opportunity to review her curriculum vitae or expert report, or to present their own expert.

Besides the Finnegan scoring, Dr. Baja-Quizon testified Kelly's NAS diagnosis was also based on: Kelly's physical exam; how she responded to the non-pharmacological comfort care; diagnostic testing, like the urine and meconium toxicology screenings she received "to identify if there [wa]s something in [Kelly]'s system that could explain the signs and symptoms that [Trinitas was] seeing objectively"; and her maternal history. She explained the general practice and procedure Trinitas follows to obtain a mother's medical history upon admission so it can anticipate potential problems that may occur during delivery. The doctor recalled it was significant Kate "had no prenatal care," admitted illicit drug use the day before delivery, and "came in with pre-term labor."

The Law Guardian inquired whether heroin and cocaine are drugs known to be potential causes of NAS, and the defense objected, arguing the question called for speculation, hearsay, and an expert opinion. The court overruled the objection, finding the question was relevant to Dr. Baja-Quizon's diagnosis and treatment of Kelly and babies with NAS, was not designed to elicit a prognosis, and Kate's admissions to using those drugs was "reliable hearsay,"

9

as the admissions were made "for the purpose of medical treatment." However, when the Law Guardian asked Dr. Baja-Quizon to confirm Kelly's positive toxicology results were not the only factor in diagnosing her with NAS, the court sustained the defense's objection because it called for expert testimony.[5] The court later sustained the Law Guardian's objection to defense counsel's questioning Dr. Baja-Quizon as to whether Kelly's case was "not

---

[5] The court stated:

> The difficulty [the court is] having with this is there's a fine line here between expert testimony and factual testimony because [Dr. Baja-Quizon] is the treating physician, so she is collecting this information and gathering and making these determinations [in] real time, not what her experience would be in making an expert opinion as to what was going on.

The court later added, in response to an objection to the Division's question, whether "poor [muscle] tone could also be attributed to [Kelly's] high calcium [level]":

> Well, obviously [Dr. Baja-Quizon is] not qualified as an expert, but if she's making decisions on an ongoing basis for purposes of determining how the course of treatment should go, or what . . . direction this is leaning, she has to rely on that experience.
>
> And here, the same way [the court] allowed it before, [testimony will be permitted] with respect to treating the child. If you just rephrase the question in terms of K[elly], and for purposes of reviewing K[elly]'s records.

10

exclusively linked to opiate use during gestation" because it called for an expert opinion.

Dr. Baja-Quizon explained a toxicology test positive for cocaine is relevant to a baby's treatment because it alerts Trinitas staff the baby may suffer withdrawal symptoms and/or from NAS, which is significant because those symptoms may not manifest immediately, as cocaine can stay in the system for five to seven days. She further explained NAS can impact a baby's health by increasing their risk for long-term neurodevelopmental disabilities, including learning deficits, ADHD, and poor executive functioning. Dr. Baja-Quizon testified Kate's admission history indicated she was "positive for cocaine and opiates."

On cross-examination, Dr. Baja-Quizon confirmed she treated Kelly from June 23 to June 30, 2023, but her actual interactions with Kelly were limited to June 23, 27, and 28. She also confirmed either drug withdrawal or pre-term birth and high calcium levels could have caused Kelly's poor feeding, explaining pre-term babies' organs may be immature and need additional time to develop. However, Dr. Baja-Quizon testified Kelly's elevated "calcium level is not something that [she] would attribute" to her poor muscle tone.

11

On January 15, 2025, the court entered an order finding Kate "committed an act of abuse and neglect against K[elly] pursuant to N.J.S.A. 9:6-8.21(c)(4)(a)" based on her grossly negligent conduct. In its accompanying written decision, it explained it found all three witnesses credible, specifically noting Dr. Baja-Quizon "testified in a deliberative and thoughtful manner, bringing examples from her extensive history working in the medical field while still focusing on the case at hand," "displayed a comprehensive knowledge of the medical records," and "did not guess or speculate." The court also noted expert testimony was not required to prove abuse or neglect, and an adequate presentation of actual harm or imminent danger can be made without experts, citing New Jersey Department of Children & Families v. A.L., 213 N.J. 1, 29 (2013).

The court found the Division presented credible evidence establishing Kelly suffered actual harm from Kate's prenatal substance abuse. It credited Dr. Baja-Quizon's testimony Kelly suffered from symptoms frequently found in babies undergoing withdrawal, including poor feeding, increased muscle tone, a high-pitch cry, irritability, and jitteriness. Although it noted Dr. Baja-Quizon testified Kelly's NAS condition was mild, with a Finnegan score of seven that did not require pharmacological treatment, comfort care was

provided as a non-pharmacological treatment option, and feeding tubes were used to address the poor feeding. The court further recounted Dr. Baja-Quizon's testimony: NAS is caused by prenatal exposure to substances; Kelly tested positive for cocaine in both her urine and meconium; and Kate's lack of prenatal care, reports of heroin and cocaine use, and pre-term labor guided Kelly's medical care. The court also credited the Division's first caseworker's testimony, who explained Kate admitted to using heroin almost daily up to the date she gave birth to Kelly and to using cocaine "every once in a while," with her last use a week prior to Kelly's birth.

The court rejected Kate's argument the Division failed to show actual harm because Kelly's symptoms were mild, she did not need pharmacologic treatment, and her elevated calcium levels could have caused her symptoms and poor feedings, rather than NAS. It reasoned Dr. Baja-Quizon's credible testimony was contrary to the defense's position, as she testified Kelly "exhibited symptoms frequently found in babies undergoing withdrawal" and her increased muscle tone was more likely related to withdrawal, rather than her elevated calcium levels.

The court also rejected Kate's argument it should not assign any weight to her admissions of using heroin and cocaine during her pregnancy because

she had been heavily sedated when she made those admissions. It reasoned the Division's first caseworker "testified in great detail regarding her conversations with [Kate]," and recalled Kate "appeared to be coherent, respectful, happy[,] and engaged in questions relative to the Division's involvement" and items necessary to properly care for Kelly. The court also found Kate's prenatal "drug use was also well documented in the medical records," noting Dr. Baja-Quizon recounted how the medical information was gathered and recorded.

The court distinguished New Jersey Division of Child Protection & Permanency v. Y.N., in which our Supreme Court reversed a decision finding a mother "violated the abuse and neglect statute solely because her newborn suffered [NAS] as a result of her participation in a medically prescribed methadone maintenance treatment program." 220 N.J. 165, 183, 187 (2014). Unlike in Y.N., the trial court reasoned Kate never sought medical advice or treatment for her drug dependency, but rather, she continued to use cocaine and heroin throughout her pregnancy without any type of prenatal care, to Kelly's detriment. It determined Kate's "willful and wanton behavior" resulted in Kelly's suffering, crediting Dr. Baja-Quizon's testimony "K[elly] suffered from poor feeding, increased [muscle] tone, a high-pitched cry, jitteriness[,] and irritability." The court noted our Supreme Court "stated unequivocally

A-3295-24

that such evidence is clearly indicative of abuse and neglect," citing In re Guardianship of K.H.O., 161 N.J. 337, 350-51 (1999).

Accordingly, the court found Kate's conduct rose to the level of gross negligence as defined in G.S. v. Department of Human Services, 157 N.J. 161, 178 (1999).  Consequently, it concluded "the Division ha[d] met its burden of proving by a preponderance of the evidence" Kate "committed an act of abuse and neglect against K[elly] pursuant to N.J.S.A. 9:6-8.21(c)(4)(a)."

On June 25, 2024, the court approved the Division's plan for termination of parental rights followed by relative resource home adoption.  On May 7, 2025, the court entered an order terminating the abuse or neglect litigation because a plan for kinship legal guardianship for Kelly was approved.

## II.

"Title 9 governs acts of abuse and neglect against a child" by providing "interim relief for children at risk and outlin[ing] the standards for abuse and neglect proceedings against parents and guardians."  A.L., 213 N.J. at 18.  "In Title [9] proceedings, the Division has the burden of proving by a preponderance of competent, material, and relevant evidence that a parent abused or neglected a child."  N.J. Div. of Child Prot. & Permanency v. B.P., 257 N.J. 361, 375 (2024).  It "need only show that it was more likely than not

that the defendant abused or neglected the child." N.J. Div. of Child Prot. & Permanency v. B.O., 438 N.J. Super. 373, 380 (App. Div. 2014). "Abuse and neglect cases 'are fact-sensitive.'" Dep't of Child. & Fams. v. E.D.-O., 223 N.J. 166, 180 (2015) (quoting Dep't of Child. & Fams. v. T.B., 207 N.J. 294, 309 (2011)).

N.J.S.A. 9:6-8.21(c)(4)(a) defines an "abused or neglected child" as a child under the age of eighteen whose:

> physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of [their] parent or guardian . . . to exercise a minimum degree of care . . . in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so.

The statute does not require a child to experience actual harm. E.D.-O., 223 N.J. at 178. Our Supreme Court has held in Title 9 cases, "[a]bsent proof of actual impairment, 'the critical focus is on evidence of imminent danger or substantial risk of harm.'" B.P., 257 N.J. at 376 (quoting A.L., 213 N.J. at 22). The danger to a child must be imminent, and "the mere possibility of the child being impaired is [in]sufficient." Id. at 379.

A parent "fails to exercise a minimum degree of care when [they are] aware of the dangers inherent in a situation and fail[] adequately to supervise

16

the child or recklessly create[] a risk of serious injury to that child." G.S., 157 N.J. at 181. "Where an ordinary reasonable person would understand that a situation poses dangerous risks and acts without regard for the potentially serious consequences, the law holds [them] responsible for the injuries [they] cause[]." Id. at 179. Further,

> where a parent or guardian acts in a grossly negligent or reckless manner, that deviation from the standard of care may support an inference that the child is subject to future danger. To the contrary, where a parent is merely negligent[,] there is no warrant to infer that the child will be at future risk.
>
> [T.B., 207 N.J. at 307.]

Appellate review of a trial court's finding of abuse or neglect is "limited," and the decision "should be upheld when supported by adequate, substantial, and credible evidence." N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014). Such deference is owed because the trial court "has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a 'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 293 (2007)).

17

"Moreover, by virtue of its specific jurisdiction, the Family Part 'possess[es] special expertise in the field of domestic relations' and thus 'appellate courts should accord deference to [F]amily [Part] fact[-]finding.'" R.G., 217 N.J. at 553 (all but last alteration in original) (quoting Cesare v. Cesare, 154 N.J. 394, 412-13 (1998)). "Therefore, '[w]e will not overturn a family court's fact[-]findings unless they are so "wide of the mark" that our intervention is necessary to correct an injustice.'" B.P., 257 N.J. at 374 (first alteration in original) (quoting N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012)).

We also recognize, however, "where the focus of the [appeal] is . . . alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom, the traditional scope of review is expanded." R.G., 217 N.J. at 552 (omission in original) (quoting In re Guardianship of J.T., 269 N.J. Super. 172, 188-89 (App. Div. 1993)). No deference is owed to a "trial court's interpretation of the law and the legal consequences that flow from established facts." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

"Appellate courts generally 'defer to a trial court's evidentiary ruling absent an abuse of discretion.'" State v. Burney, 255 N.J. 1, 20 (2023)

18

(quoting State v. Garcia, 245 N.J. 412, 430 (2021)). "A court abuses its discretion when its decision is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis." Ibid. (quoting State v. Chavies, 247 N.J. 245, 257 (2021)) (internal quotation marks omitted).

A.

Kate asserts the court denied her due process when it refused to qualify Dr. Baja-Quizon as an expert but then permitted her to testify regarding matters concerning scientific, technical, and specialized knowledge, rather than limiting her testimony to her personal observations. She argues the court also failed to conduct a hearing pursuant to N.J.R.E. 104 in its "gatekeeper role" to assess the admissibility of Dr. Baja-Quizon's opinions. Kate also contends the court erred in concluding expert testimony was unnecessary pursuant to New Jersey Division of Youth & Family Services v. J.Y., 352 N.J. Super. 245 (App. Div. 2002), because J.Y. emphasizes fact-finding in Title 9 litigation must be based on competent and reliable evidence to protect parental rights. Although she acknowledges expert testimony is not always required, Kate maintains when a court relies on a treating physician as an expert, it must

19

hold the physician to traditional reliability standards and provide the opposing party an opportunity to prepare and respond.

According to Kate, the court failed to properly distinguish between Dr. Baja-Quizon's fact and expert testimony by improperly allowing the doctor to opine on matters involving specialized knowledge, such as the risks of prenatal drug exposure to an infant and the reliability of Finnegan scoring. Because the Division did not present Dr. Baja-Quizon as an expert or serve an expert report, she received no notice the doctor would opine on those issues. Kate refutes Dr. Baja-Quizon's claim the Finnegan scoring system is an objective test. She also emphasizes interpreting data in a child's medical record is the function of an expert. Kate further contends the court failed to review the methodology Dr. Baja-Quizon employed to reach her conclusions, including its general acceptance in the relevant scientific community. Kate concludes the doctor's testimony "blurred the line between factual observation and expert opinion."

Kate also argues the court erred in allowing Dr. Baja-Quizon to offer a speculative net opinion Kelly suffered from NAS, which was unsupported by any reliable methodology or the "why and wherefore" of the doctor's conclusions. She contends NAS is a complex diagnosis requiring expert

20

testimony under N.J.R.E. 702, as it involves weighing multiple factors through the subjective Finnegan scoring system.

Kate highlights Dr. Baja-Quizon's testimony regarding Kelly's premature birth being a "possible cause" for symptoms captured in the Finnegan scoring. She challenges the reliability and objectivity of the Finnegan scoring system based on scientific literature she claims demonstrates it is not a foolproof method to diagnose infants suffering from withdrawal, particularly for babies like Kelly who were born prematurely. Kate claims Dr. Baja-Quizon documented Kelly was only at "risk of NAS" in her medical records, and her Finnegan scores were consistently low, never reaching the threshold for medical intervention.

"Our courts have long permitted treating physicians to offer medical testimony regarding the diagnosis and treatment of their patients, pursuant to N.J.R.E. 701." Delvecchio v. Twp. of Bridgewater, 224 N.J. 559, 576 (2016). The Supreme Court has held treating physicians may testify as fact witnesses regarding their diagnosis and treatment of a patient and their "determination of [a] disorder's cause." Stigliano by Stigliano v. Connaught Labs., Inc., 140 N.J. 305, 314 (1995); Delvecchio, 224 N.J. at 563 (finding the trial court erred in barring the treating physicians' testimony regarding the plaintiff's diagnosis

21

and treatment where neither physician was presented as an expert witness nor prepared an expert report). "Because the determination of the cause of a patient's illness is an essential part of diagnosis and treatment, a treating physician may testify about the cause of a patient's disease or injury." Delvecchio, 224 N.J. at 577 (quoting Stigliano, 140 N.J. at 314). Treating physicians provide factual information, even though they are competent to testify as an expert, and the information may come in the form of an opinion. Id. at 577-78.

In Stigliano, our Supreme Court stated, "Although the treating doctors are doubtless 'experts,' in this case they are more accurately fact witnesses. Their testimony relates to their diagnosis and treatment of the . . . plaintiff. In this context, moreover, the characterization of the treating doctors' testimony as 'fact' or 'opinion' creates an artificial distinction." 140 N.J. at 314. It noted, "A determination of causation partakes of both fact and opinion. The critical point is that the treating doctors[,] to treat their patients[,] must determine the cause of a disease, whether that determination is characterized as fact or opinion." Ibid. The Court further observed:

> Without impugning the expert witnesses who may testify for either plaintiffs or defendants, the treating doctors may be the only medical witnesses who have not been retained in anticipation of trial. A jury could

A-3295-24

find the treating doctors' testimony to be more impartial and credible than that of the retained experts. Excluding the treating doctors' testimony would undermine the ultimate objective of a trial, the determination of the truth. On balance, we find that the probative value of the treating doctors' testimony outweighs any prejudice to [the] plaintiffs.

[Id. at 317-18.]

Further, a fact witness can testify "in the form of opinions or inferences . . . if [their testimony]: (a) is rationally based on the witness'[s] perception; and (b) will assist in understanding the witness'[s] testimony or determining a fact in issue." N.J.R.E. 701. This testimony can also embrace the ultimate issue. N.J.R.E. 704.

The net opinion rule precludes expert witnesses from offering "conclusions that are not supported by factual evidence or other data." Townsend v. Pierre, 221 N.J. 36, 53-54 (2015) (quoting Polzo v. Cnty. of Essex, 196 N.J. 569, 583 (2008)). An expert must "give the why and wherefore that supports the[ir] opinion, rather than a mere conclusion." Id. at 54 (quoting Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013)) (internal quotation marks omitted). An expert's "bare conclusions, unsupported by factual evidence, [are] inadmissible." Davis v. Brickman

23

Landscaping, Ltd., 219 N.J. 395, 410 (alteration in original) (quoting Buckelew v. Grossbard, 87 N.J. 512, 524 (1981)).

"The net opinion rule is not a standard of perfection. The rule does not mandate . . . an expert organize or support an opinion in a particular manner that opposing counsel deems preferable." Townsend, 221 N.J. at 54. An "expert's failure 'to give weight to a factor thought important by an adverse party does not reduce [their] testimony to an inadmissible net opinion if [they] otherwise offer[] sufficient reasons which logically support [their] opinion.'" Ibid. (quoting Rosenberg v. Tavorath, 352 N.J. Super. 385, 402 (App. Div. 2002)).

The trial court did not err in allowing Dr. Baja-Quizon to testify regarding her diagnosis and treatment of Kelly or the cause of Kelly's condition based upon the knowledge she obtained from the care she rendered to Kelly. Dr. Baja-Quizon functioned in a hybrid capacity, as her testimony included both factual observations and the opinions she formed from those observations and her medical expertise. She did not need to be formally qualified as an expert to offer those opinions. The court properly permitted Dr. Baja-Quizon to testify about the opinions she formed during her care and treatment of Kelly. Moreover, it properly limited her testimony as a quasi-fact

24

witness under <u>Stigliano</u> to describing Kelly's symptoms, the factors that went into the NAS diagnosis, and the comfort care Trinitas provided Kelly, based on her and her colleagues' observations contained in the hospital records. See <u>Stigliano</u>, 140 N.J. at 314.

The court sustained multiple objections, including those made by defense counsel, to questions calling for traditional expert testimony, specifically as to: the long-term effects of prenatal cocaine exposure on a child; why Kelly's meconium did not test positive for heroin; whether Kelly's case was exclusively linked to Kate's opiate use; and whether Kelly's positive toxicology results were the only factor considered in diagnosing her with NAS. Conversely, the court overruled other objections and allowed Dr. Baja-Quizon to testify about the significance of Kate's prenatal drug use to Kelly's NAS diagnosis, and whether those drugs are known to cause NAS. It reasoned those questions related to Dr. Baja-Quizon's experience and were relevant to diagnosis and treatment, not to future effects or prognoses.

The trial court properly determined expert testimony was not necessary for it to find Kate's prenatal drug use caused Kelly harm, as expert testimony—although it may be helpful—is not always required to prove actual harm in an abuse and neglect case. See <u>A.L.</u>, 213 N.J. at 28-29. Rather, when there is

25

actual harm, as here, proof of such harm "may come from any number of competent sources including medical and hospital records, health care providers, caregivers, or qualified experts." Id. at 23.

Actual harm can be established through proof a child suffered drug withdrawal symptoms at birth or by "showing evidence of respiratory distress, cardiovascular or central nervous system complications, low gestational age at birth, low birth weight, poor feeding patterns, weight loss through an extended hospital stay, lethargy, convulsions, or tremors." Id. at 22-23. Here, the Division presented evidence of actual harm through Dr. Baja-Quizon's testimony and Kelly's medical records, which showed Kelly suffered withdrawal symptoms including irritability, jitteriness, a high-pitch cry, increased muscle tone, and "difficulty bottle feeding due to incoordination."

The court's finding Kelly suffered actual harm from Kate's prenatal substance abuse was based on Dr. Baja-Quizon's NAS diagnosis and her testimony Kelly suffered from symptoms frequently found in babies undergoing withdrawal. Dr. Baja-Quizon's qualifications as a neonatologist were not challenged, and there was ample evidence in the record to support the court's conclusions.

Kate did not object to Dr. Baja-Quizon's testimony regarding Kelly's Finnegan scores or otherwise challenge the scoring system's reliability during the hearing. When no objection is made to the admission of evidence, but it is challenged on appeal, the plain error standard applies. See R. 2:10-2; State v. Santamaria, 236 N.J. 390, 404-05 (2019). Plain error is a "high bar" to clear. Santamaria, 236 N.J. at 404. Defense counsel specifically questioned Dr. Baja-Quizon regarding the Finnegan scoring system. Accordingly, "strategic reasons can be inferred from [defense] counsel" questioning Dr. Baja-Quizon regarding the system, and counsel's "failure to [otherwise] object . . . suggests that it was not perceived to be as fatal as is now argued." T.L. v. Goldberg, 238 N.J. 218, 232 (2019); Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 523 (2011).

Moreover, Kelly's Finnegan scores were not the only factor Dr. Baja-Quizon used in diagnosing Kelly with NAS. Dr. Baja-Quizon testified other factors informed her opinion, including a physical exam, Kate's maternal history, Kelly's positive toxicology reports, and the observations of Kelly's physical symptoms that were demonstrative of withdrawal. For these reasons, Dr. Baja-Quizon did not provide an improper speculative net opinion regarding the NAS diagnosis, given she explained the factors that went into Kelly's NAS

A-3295-24

diagnosis, the methodology used to calculate Kelly's Finnegan scores, and the physical withdrawal symptoms Kelly exhibited.

B.

Kate further argues the court erred in finding abuse and neglect because exposure to illicit substances in utero "is not a harm without evidence it caused injury to the child after birth," and the Division must prove causation. She contends the Division failed to prove her prenatal drug use harmed Kelly rather than an alternative medical condition, such as Kelly's exposure to the morphine the hospital administered to Kate during the cesarean section, Kelly's status as a pre-term infant, or Kelly's elevated calcium levels. Kate asserts the medical records admitted at trial over her objection included toxicology reports that did not demonstrate Kelly was exposed to opioids, and those reports clearly state Kelly's positive toxicology samples did "not meet [the] chain of custody requirements for a medical legal drug test." She further asserts the toxicology report for Kelly's meconium sample was not included in the record. Although she concedes there was a note in the record indicating the test was positive, she points out it lacked documentation regarding the chain of custody.

Kate relies on A.L., 213 N.J. at 34, where she claims the Court reversed a finding of abuse and neglect under similar facts. She contends the evidence here, as in A.L., 213 N.J. at 28, did not meet "traditional standards for reliability," asserting the medical records included drug tests that did not comply with reliable collection methods and did not conclusively demonstrate Kelly had NAS. Kate also claims the court impermissibly focused on the morality of, and her culpability for, prenatal drug use, rather than whether it actually harmed Kelly.

We affirm substantially for the reasons set forth in the trial court's comprehensive and well-reasoned opinion and add the following comments. Kate did not object to Dr. Baja-Quizon's testimony regarding the positive toxicology reports during the hearing. In fact, defense counsel stated they had no objection to Dr. Baja-Quizon's testimony regarding the positive results. Counsel also questioned the doctor on cross-examination about the toxicology reports. Accordingly, Kate is precluded from challenging the reliability of the reports for the first time on appeal. See Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973) (Appellate courts do not "consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available 'unless the questions so raised on appeal go to the

jurisdiction of the trial court or concern matters of great public interest.'" (quoting Reynolds Offset Co. v. Summer, 58 N.J. Super. 542, 548 (App. Div. 1959))).

Moreover, the court did not improperly focus on the morality of Kate's prenatal drug use. While a parent's use of drugs, without more, will not necessarily support a finding of abuse or neglect, a mother's use of illegal substances during pregnancy is relevant to determining whether there was abuse or neglect through "proof that a child is suffering from withdrawal symptoms at birth." A.L., 213 N.J. at 22. There was sufficient evidence in the record showing Kate's prenatal drug use caused Kelly to suffer withdrawal symptoms. Kate admitted to using heroin daily and cocaine occasionally while pregnant with Kelly, including using heroin up until the day she delivered Kelly. Kelly and Kate both tested positive for cocaine, and Kate also tested positive for opiates.

Although Dr. Baja-Quizon testified either drug withdrawal or pre-term birth and high calcium levels could have caused Kelly's poor feeding, she stated Kelly's high calcium level "is not something that [she] would attribute" to her increased muscle tone. Further, only Kate's prenatal drug use could have caused Kelly to test positive for cocaine at birth. This, coupled with the

30

observations of Kelly's withdrawal symptoms, was sufficient to support the court's decision. For these reasons, we conclude it did not err in finding Kate committed an act of abuse and neglect against Kelly pursuant to N.J.S.A. 9:6-8.21(c)(4)(a).

To the extent we have not specifically addressed any remaining arguments Kate raised, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanley

Clerk of the Appellate Division